## Cramer's Election Case.

*Elections—Election booths — Arrangement — Act of June 10, 1893, Sec. 19, P. L. 419—Violation—Invalidity of election—Certiorari—Practice, Supreme Court.*

1. Where a legislative provision is accompanied by a penalty for failure to observe it, the provision is mandatory.

2. The provisions of the Act of June 10, 1893, Sec. 19, P. L. 419, relating to the arrangement of the rooms in which elections are held are mandatory and where they have been disregarded without excuse or justification, the ballots cast will be void and the returns from wards wherein such violations occurred cannot properly be reckoned in the general count.

3. Where in a contested election case it appeared from the findings of the lower court that in violation of the Act of June 10, 1893, Sec. 19, P. L. 419, two separate rooms were employed for holding the election, one of which was occupied by the election board and in which the ballot box was placed, and the other contained the booths wherein the voters marked their ballots, that instead of a guard rail, a rope was employed which did not serve the purpose of excluding from the space reserved for voters all but the election board and persons actually engaged in voting, so that there was no restraint upon interference with voters who entered the booth, and that at the election certain votes cast for an office other than that contested had been purchased, the Court of Quarter Sessions erred in refusing to find that all the votes cast under such circumstances were invalid, although no actual fraud was shown as to the contested vote for the office in contest.

4. While ordinarily on certiorari to the Supreme Court the

power of the court is revisory and is restricted to the record, in election contests, which occupy a middle ground between common law and proceedings in equity, the opinion of the lower court, though not strictly a part of the record, is open to examination to discover the grounds of the court's action.

Argued Jan. 11, 1915. Appeal, No. 294, Jan. T., 1914, by petitioners, from decree of Q. S. Fayette Co., Dec. Sess., 1913, No. 5, adjudging that Charles T. Cramer was the duly elected tax collector of the Borough of Uniontown, in case of Alexander W. Craig, John Thorndell, Matt Allen, O. M. Boughner, Earl S. Areford, C. A. Rhoads, Chad. L. John, D. W. McDonald, Percy D. Hagan, Thomas W. Hunt, A. A. McDowell, John W. Wood, John O. Clark, James Hankins, James R. Cray, W. C. John, D. E. Bane, J. W. Dawson, Thomas J. Moyer, L. H. Frasher, A. C. Hagan, W. C. McKean, R. W. Dawson, C. J. McCormick, John S. Christy, Charles A. Tuit, B. H. Briehof, Daniel Sturgeon, George B. Jeffries, Orris E. Keener, J. Searight Marshall v. Charles T. Cramer. Before BROWN, C. J., MESTREZAT, ELKIN, STEWART and FRAZER, JJ. Reversed.

Petition for leave to contest an election. Before VAN SWEARINGEN, J.

The opinion of the Supreme Court states the facts.

The trial judge found that respondent was the duly elected tax collector of the Borough of Uniontown. Petitioners appealed.

*Errors assigned* were findings of fact of the trial judge and the decree of the court.

*H. S. Dumbauld,* for appellants.

*W. J. Sturgis,* for appellee.

OPINION BY MR. JUSTICE STEWART, February 22, 1915:
This proceeding was instituted in the Court of Quar-

ter Sessions of Fayette County upon the petition of the requisite number of qualified voters contesting the election of Charles T. Cramer to the office of tax collector of the Borough of Uniontown in said county. The election had been held 4th of November, 1913, and by the returns filed it appeared that of the whole number of votes cast for tax collector, Charles T. Cramer received 1110, and J. Searight Marshall, the opposing candidate, 1069. The contest involved the integrity of the election held in the fourth ward of the borough. The vote as returned shows a majority in the entire borough of 41 for Cramer over Marshall. The contention on the part of the petitioners was that because of certain irregularities, to which we shall more particularly refer hereafter, in the holding of the election in this ward, the election there held was invalid, and that the returns of said ward are not to be included in the general count. Had this contention prevailed, Marshall and not Cramer would be entitled to the certificate of election, since, eliminating from the count the votes cast in the fourth ward, Marshall would be the majority candidate by 21 votes. Answer was filed by Cramer denying the material averments in the petition. The case was heard on petition, answer and evidence taken in support of petitioners' averments, with the result that petitioners failed in their contention before the court, and it was adjudged and decreed "that Charles T. Cramer had received the greatest number of votes for the office of tax collector of the Borough of Uniontown at the election held on November 4th, 1913, and is entitled to the certificate of election." The case is brought to this court by certiorari, and the field of our inquiry is therefore a restricted one. Under a certiorari, we have simply revisory power, and in the exercise of such power while we may examine and revise the record for the purpose of seeing whether the court below exceeded its jurisdiction or its proper legal discretion, to the record we are confined; and as a result of this restriction, the actual

merits of the case are not a subject of inquiry, and the
evidence is therefore a matter wholly aside. Neverthe-
less, in election contests, because these occupy a middle
ground between common law and proceedings in equity,
the opinion of the court, though not strictly part of the
record, is open to examination to discover the grounds
of the court's action. Independence Party Nomination,
208 Pa. 108. In the present case the learned judge in
his opinion filed states very fully the facts as he derives
them from the evidence. Under the authority just cited,
it becomes our duty to inquire whether, upon such facts
as found, the court exercised proper legal discretion in
holding that the election here contested was a valid elec-
tion, and that Cramer was duly elected to the office of
tax collector. The petition of contestants contained a
number of charges affecting the integrity of this particu-
lar election besides that one to which we propose to
make special reference, but the findings with respect to
these were adverse to petitioners' contention, and they
are therefore eliminated from the present inquiry, which
must be confined to a consideration of such facts as the
court has found to exist, and in view of which the
election returns of the fourth ward have been sustained.

We come now at once to the charge that the place
where the election was held was, with respect to its ar-
rangements and appointment, in flagrant disregard of
legal requirements, and that in consequence the election
was illegal. That the extent of this departure may be
understood, it is necessary to have clearly in mind what
the law requires with respect to a place of election. The
Act of 10th June, 1893, P. L. 419, in Sec. 19, provides
as follows: "The county commissioners of each county
shall provide for each election district therein, at each
election, a room large enough to be fitted up with voting
shelves and a guard rail as hereinafter provided. If in
any district no such room can be rented or otherwise ob-
tained, the said commissioners shall cause to be con-
structed for such district, a temporary room of adequate

size to be used as a voting room. They shall also cause all the said rooms to be suitably provided with heat and light and with a sufficient number of voting shelves or compartments, at, or in which, voters may conveniently mark their ballots, with a curtain, screen or door, at the upper part of the front of each compartment, so that in the marking thereof they may be screened from the observation of others, and a guard rail shall be so constructed and placed that only such persons as are inside of said rail can approach within six feet of the ballot box and of such voting shelves or compartments. The arrangement shall be such that neither the ballot box nor the voting booths shall be hidden from view of those just outside of the said guard rails. The number of such voting shelves or compartments shall not be less than one for every seventy-five names on the assessor's list; but shall not in any case be less than three for the voters qualified to vote at such voting place. No persons other than the election officers and voters admitted as hereinafter provided, shall be permitted within the said rail, except by authority of the election officers for the purpose of keeping order and enforcing the law."

The facts with respect to the circumstances attending the election at this fourth ward poll as recited in the opinion filed, are these: "Such an arranged room as is required by the act cited was not provided or used at the election in question. The election was held in a one-story frame building, 18 x 24 feet in size, used originally by the owner as a place for making wire fence, and later as a storage room in connection with his place of business. At that time the entire inside of the building remained in one large room. About four years ago, while in that condition, the building was established as a polling place for that ward, and it remained in that condition until a short time prior to the primary preceding the election in question, when a separate room in one corner of the building was constructed by the erection of two partitions to be used as a cobbler's shop. The re-

maining big room was used for election purposes at the primary election on September 16th, 1913. After that primary, and about a week prior to the general election, the owner of the building erected two partitions through the large room, constituting a division of the entire building into four rooms. At the time of the election in controversy, the two rooms in the other end were used for purposes of the election. The main entrance from the street was into the front one of these two rooms and the door leading from that room into the one back of it was in the corner of the front room, diagonally across from the front door which was not quite in the corner of the front room. The, owner of the building, in ar-. ranging for the election, the day before it was held, erected the voting booths in the back room, all of them except one being in the positions and places they had occupied at previous elections. The table and chairs for the election officers were placed in the front room away from the doors, and an inch rope was stretched from the side of the front door next to the tables to the same side of the front door leading into the back room, thus separating the space occupied by the election board from that in front of the rope, and allowing voters to get their ballots from the election board over the ropes and pass on into the other room, which extended further toward the other end of the building than did the front room, and mark their ballots in the booths, and returning deposit their ballots in the ballot box which was kept just inside the rope in that portion of the front room occupied by the election officers through the door between the two rooms and others of them were not. All of them were in view of persons outside the rope at a position near the door between the two rooms. The ballot box at all times was in view of all persons on either side of the rope in the front room."

The case as here presented by these findings of fact shows an open disregard of the requirements of the act manifestly sufficient, because of omissions of many ma-

terial requirements, to defeat the purpose of the act, given a disposition on the part of any present to take advantage of existing irregularities to obtain fraudulent results. It is only necessary to indicate some of the derelictions which rendered fraudulent practice, if not easy, certainly far less difficult of accomplishment than would have been the case had the requirements of the act been complied with. A manifest prerequisite to the accomplishment of legislative purpose is a room at the place appointed for the holding of the election sufficient in dimensions to admit of the employment of such safe guards as are provided for by the act. Except as such room is provided an election conducted in the manner prescribed would be utterly impracticable. In the present case whatever irregularity there was in this election resulted from the fact that two separate rooms were employed. One of these was occupied by the election board and in this was placed the ballot box; the other contained the booths which the voters used to mark their ballots. We have no distinct finding by the court that either of these two rooms was adequate in itself, but, considering the dimensions given of the entire building, and the manner of its sub-division, it is clear that neither by itself would have been adequate, and to this inadequacy is to be referred most of the irregularities to which our attention has been directed. The rope which was employed as a substitute for a guard rail, placed as it was, served not a single purpose for which it was prescribed. The main purpose of the guard rail is to exclude all persons from the space containing the booths and occupied by the election board having in charge the ballot box, except such as are admitted for the purpose of receiving, marking and depositing the ballot; and to prevent all persons, except the voter admitted for the purpose of voting, from approaching within six feet of the ballot box. In this case the rope that was substituted for the guard rail ran directly alongside the ballot box, and was within the reach of

those who stood outside or who passed from one room into the other. The voter received his ballot, not within the guard rail, but while standing outside the rail; and instead of entering within the rail, to mark it and cast it, he retired to the adjoining room where the booths were protected by no guard rail or rope; then returning to the front room, and without entering the guard rail there, but standing outside with persons there assembled, he handed his vote to the election officer. Under such conditions there was absence of all restraint upon interference with the voter who entered the booth to mark his vote, and considering the fact found by the court, that at this election there were cast votes which had been bought at a price, though not for the office of tax collector, it is made clear beyond question, that if no such fraudulent votes were cast for the office of tax collector, it was not because opportunity was not afforded by the absence of the safe guards prescribed by law. The court finds that with respect to the election of tax collector, notwithstanding the irregularities he refers to, no actual fraud was shown, and it is upon this finding that he rests his decree in the case. The position taken assumes that the provisions of the act above recited are directory merely, and not mandatory, and that no disregard of these will vitiate the poll except as actual fraud is shown, and then only as the fraudulent votes can not be separated from those legally cast. To this we can not agree. The purpose of the act in requiring such safe guards as those prescribed is strictly protective. The act was not framed with a view to discover fraud when practiced, or to provide a method for the correction of the returns where fraudulent votes have been cast, but its sole purpose was to prevent fraud in the first instance, and the requirements were designed to this end. That the legislature understood and intended the provisions of the act to be mandatory is evident not only from the fact that the language used is imperative, but for the still stronger reason that by the 33d Sec., it is made a misdemeanor for

any public officer upon whom a duty is imposed by the act to negligently or wilfully fail to perform such duty, or negligently or wilfully perform it in such a way as to hinder the objects of the statute, or negligently or wilfully violate any of the provisions thereof. It is an established rule of construction that where a legislative provision is accompanied with a penalty for failure to observe it, the provision is mandatory. It would offend against the plain and unmistakable meaning of such a statute to otherwise construe it. Aside from this, it is too clear for debate that except as provisions of the act referred to are held mandatory the whole purpose of the act is defeated; and, as, has been said by another, the opportunities for fraud are increased rather than diminished. So it is not a question whether the fraudulent votes that were admittedly introduced into this ballot box—votes that had been openly purchased and that too by a county detective—were cast for this respondent, or whether these could be identified and eliminated from the count; these matters are wholly aside. As we have said it was not for the purpose of detecting or correcting fraud that the act was passed, but for the prevention of it. As here conducted the election at this particular poll prevented nothing in the way of fraudulent practice that would not have been equally guarded against by the law as it stood before this act was passed.

A necessary conclusion from what we have said must be that the election held for the fourth ward in the Borough of Uniontown was wholly illegal, since in the conduct of the same, requirements of the statute absolutely essential to its efficiency, and therefore imperative, if for no other reason, were flagrantly disregarded, and that too without excuse or justification.

The circumstances to which our attention has been directed by way of excuse and avoidance of the result indicated, are wholly without influence. It is not for us to apportion the responsibility for these gross derelictions between the county commissioners and the board of

election officers; it is enough to know that both fully understood the requirements of the law, and that at the instance of either, however late the insufficiency of the room was discovered, the matter was open to correction by application to the court, under Sec. 2, Act of April 17, 1866, P. L. 107. The partition wall which divided the one room into two had been erected by the owner without any right whatever, and, so far as appears, its removal could have been accomplished without trouble or serious delay. The findings do not disclose that this unwarranted interference with the room was made the subject of remonstrance, or that any demand for its removal was made. The officials charged with responsibility simply acquiesced in conditions which made a legal election at that place impossible so long as these existed, and made no effort at their correction. Every voter at that poll on that day must be held to a knowledge of the fact that the requirements of the statute were not being complied with, but were being openly and flagrantly disregarded, and acquiescence on their part in the dereliction leaves but little ground for them to complain if the entire vote of the ward should be stricken out. The remedy was as available to them as to the officials.

If the election was illegal—and we so hold, for the reasons stated—then it follows that the return from the ward was improperly reckoned in the general count, and must be thrown out. Precedent and authority for this course may be found in Melvin's Case, 68 Pa. 333, and the cases there cited and reviewed.

The decree is reversed, and now February, 1915, it is ordered, adjudged and decreed that J. Searight Marshall is the duly elected tax collector of the Borough of Uniontown, and that the proper certificate of his election to said office be issued to him accordingly.