## South Union Township Election

*A. Cavalcante,* for contestants.

MORROW, J., October 10, 1947.—Contestant, Harry W. Brooks, was a candidate for nomination on the Democratic ticket for the office of road supervisor in South Union Township at the primary election held September 9, 1947. There were eight candidates with one to be nominated. This township is divided into three election districts. The returns from the three districts give Charles "Snub" Gavorcik the highest number of votes, his total being 396. Contestant received 389 votes, the next highest. A primary election contest was duly instituted by and on behalf of contestant Brooks. It is sought to have the vote in the second district rejected and not counted in determining who was nominated on the Democratic ticket for the office of supervisor. Testimony was taken and therefrom we make the following

### Findings of fact

1. The returns of the election officers of the three districts of South Union Township for the office of road

supervisor on the Democratic ticket as computed by the Fayette County Board of Elections show the following results:

First District:

| | |
|---|---|
| John Sicina | 170 votes |
| Joe Marcinko | 76 votes |
| James A. Grigsby | 39 votes |
| Charles "Snub" Gavorcik | 114 votes |
| T. J. "Tom" Sampey | 35 votes |
| Mike Seman | 78 votes |
| Emory Ringer | 77 votes |
| Harry W. Brooks | 208 votes |

Second District:

| | |
|---|---|
| John Sicina | 33 votes |
| Joe Marcinko | 13 votes |
| James A. Grigsby | 34 votes |
| Charles "Snub" Gavorcik | 201 votes |
| T. J. "Tom" Sampey | 19 votes |
| Mike Seman | 25 votes |
| Emory Ringer | 12 votes |
| Harry W. Brooks | 46 votes |

Third District:

| | |
|---|---|
| John Sicina | 73 votes |
| Joe Marcinko | 23 votes |
| James A. Grigsby | 86 votes |
| Charles "Snub" Gavorcik | 81 votes |
| T. J. "Tom" Sampey | 22 votes |
| Mike Seman | 22 votes |
| Emory Ringer | 13 votes |
| Harry W. Brooks | 135 votes |

Total Results:

| | |
|---|---|
| John Sicina | 276 votes |
| Joe Marcinko | 112 votes |
| James A. Grigsby | 159 votes |
| Charles "Snub" Gavorcik | 396 votes |

T. J. "Tom" Sampey .............. 76 votes
Mike Seman ..................... 125 votes
Emory Ringer ................... 102 votes
Harry W. Brooks ................ 389 votes

2. The numbered list of voters shows that Clarence E. Moyer was voter number 670, and that after him 100 persons are listed as having voted, 70 of whom voted the Democratic ticket. Moyer voted shortly after the hour for the closing of the polls. Assuming that he was the first who voted after the closing hour and allowing for 14 legal votes after that hour, there appears to have been at least 63 Democratic votes cast after the time the voting should have ended, 7 of the said 14 votes being Democratic. These 63 Democratic votes irregularly received after the voting should have been stopped were from legal voters.

3. When the closing hour arrived the judge of election had the entrance door to the large room where the election was being held locked, allowing approximately 100 voters waiting to vote to remain in the room and vote after the closing hour as aforesaid. The voting then continued for about an hour or longer until all in the room desiring to vote had voted.

4. The numbered list of voters in this second district gives the names of 494 persons that voted the Democratic ticket during the entire day. As appears in the first finding of fact a total of 383 Democratic votes were cast for the various candidates for the office of supervisor. There are nine blank spaces for names on this numbered list prior to the name of Clarence E. Moyer, mentioned in the second finding of fact, and seven like blank spaces after Moyer's name, and prior to the name Helen M. Hay, the last person that voted.

5. In the first district of said township when the hour fixed by law for closing the polls arrived there were 75 qualified Democratic electors and upward in the polling place outside the enclosed space waiting to vote. The election officers of said first district permitted

all qualified electors who were qualified and were inside the enclosed space to vote; and, in addition thereto, permitted only 10 qualified electors who were in the polling place outside the enclosed space waiting to vote, to do so, and refused to permit the remainder of the said 75 qualified Democratic electors and upward to qualify and vote.

## Discussion

The primary question involved pertains to the allowance of voting after the time when the polls should be closed and the effect of so doing. The law now governing elections is the Pennsylvania Election Code of June 3, 1937, P. L. 1333. Provisions thereof pertinent to the present controversy are the following:

"Section 102. . . .

"(q) The words 'polling place' shall mean the room provided in each election district for voting at a primary or election."

Section 301. . . .

"(b) In each county of the Commonwealth, the county board of elections shall consist of the county commissioners of such county ex officio, or any officials or board who are performing or may perform the duties of the county commissioners, who shall serve without additional compensation as such."

"Section 302. Powers and Duties of County Boards. The county boards of elections, within their respective counties, shall exercise, in the manner provided by this act, all powers granted to them by this act, and shall perform all the duties imposed upon them by this act, which shall include the following:

. . . . . . . .

"(b) To select and equip polling places.

"(g) To instruct election officers in their duties, calling them together in meeting whenever deemed advisable, and to inspect systematically and thoroughly the conduct of primaries and elections in the several

election districts of the county to the end that primaries and elections may be honestly, efficiently, and uniformly conducted."

"Section 1205. At all primaries and elections the polls shall be opened at 7 A. M., Eastern Standard Time, and shall remain open continuously until 8 P. M., Eastern Standard Time, at which time they shall be closed."

"Section 1214.

"(a) No elector shall be allowed to enter the enclosed space until he shall be found entitled to vote.

. . . . . . . .

"(c) In districts in which voting machines are used, an elector, after being found to be qualified and admitted within the enclosed space, shall be admitted to the voting machine booth as soon as it is vacant, and shall be permitted to vote.

"(d) Not more than twice as many electors waiting to vote as there are voting compartments or voting machines in use in the district shall be admitted within the enclosed space at any one time."

"Section 1220.

"(a) Until the polls are closed, no person shall be allowed in the polling place outside of the enclosed space at any primary or election, except the watchers, voters not exceeding ten at any one time who are awaiting their turn to vote, and peace officers, when necessary for the preservation of the peace."

. . . . . . . .

"(e) When the hour for closing the polls shall arrive, all qualified electors who have already qualified, and are inside the enclosed space, shall be permitted to vote; and, in addition thereto, not more than ten (10) qualified electors who are in the polling place outside the enclosed space waiting to vote, shall be permitted to do so, if found qualified, but no other persons shall be permitted to vote.

"(*f*) It shall be the duty of the judge of election to secure the observance of the provision of this section, to keep order in the voting room, and to see that no more persons are admitted within the enclosed space than are permitted by this act. The judge of election may call upon any constable, deputy constable, police officer or other peace officer to aid him in the performance of his duties under this section."

It clearly appears from the testimony that provisions of the Election Code quoted were violated in the second district of South Union Township. That at least a part of the violation was not through ignorance of the law appears in the following testimony of one of the election officers:

"Q. Do you know how many electors are entitled to vote when the hour for closing the polls arrives?

"A. Two for each machine plus ten.

"Q. You knew that.

"A. Yes."

This election officer, it would seem, had studied the "Election Officers' Manual" furnished to such officers, as he quoted substantially section 511 thereof, reading as follows:

"When the hour for closing the polls shall arrive, all qualified electors who have qualified and are inside the enclosed space shall be permitted to vote; and, in addition thereto, not more than ten (10) qualified electors who are in the polling place outside the enclosed space waiting to vote, shall be permitted to do so, if found qualified, but no other person shall be permitted to vote."

The attitude of the election officers may harmonize with that of one of the workers as reflected in the following testimony given by him:

"All that were inside the polls at 9 o'clock were permitted to vote.

"Q. Do you know what the law says?

"A. Well, the law was made for crooks and we wasn't crooks, we wasn't interested in it."

This view of the matter, that of being above the law, overlooks the injustice that may result therefrom. Article VIII, sec. 7, of the Constitution of Pennsylvania prescribes that all laws regulating the holding of elections by the citizens shall be uniform. As appears in our fifth finding of fact the election officers in the first election district, complying with the law, refused to allow about 65 Democratic voters to vote. They were qualified voters waiting to vote when the closing hour arrived. It will be observed that in this district contestant was running strong, while in the said second district the situation was reversed and respondent was getting a great percentage of the votes. It appears in the first finding of fact that in this second district contestant received only 46 votes in all and respondent was given 201 votes. How many of the 63 Democratic votes irregularly cast after the closing hour were received by any one candidate it is impossible to know. Notwithstanding this contestant lost by only seven votes.

Counsel for contestant cites an early Philadelphia case and relies on its reasoning. The case is Election of Locust Ward, 3 Clark 11. In it the court, after pointing out that the law left nothing to the discretion of the election officers about the time to close the polls, says (p. 17) :

"In our opinion, the true principle is this; where an election has been kept open after the hour required by law when it should be closed, and the number of votes received after that time are clearly ascertained, and those votes if all had been given to the majority candidate, could in no event have changed the result, we would not, purely on that ground, set aside the election . . .

"But where the majority for the candidate is small, and the evidence is of such a character as to render it

uncertain as to the number of votes polled after the hour when the election should have been closed; where there is imprecision as to the true state of the case, and the result thereby rendered uncertain, and it is thereby rendered doubtful who has a majority of the votes polled within the time prescribed by law; then, in such a case, it is unquestionably our duty to set the election aside. . . ."

In this case the court concluded (p. 18) :

"From the evidence which has been adduced, it is manifest that the length of time the polls were kept open is uncertain, and the number of votes polled after that hour is equally uncertain; and there is no safe chart for our guide in deciding who had a majority of the votes polled within the hours prescribed by law. In all such cases it seems to me the course of duty is plain; we ought to set aside the election. . . ."

The court pointed out that the votes after closing time were votes of legal voters and that they should not be compelled to disclose for whom they voted and that from any other source such proof could not be derived. The preservation of secrecy in voting is made certain in article VIII, sec. 4, of our Constitution.

In Swick's Nomination, 1 D. & C. 417 (1921), it is held to the effect that if election officers at a primary election keep the polls open after closing time and permit persons to vote other than those within the enclosed space as prescribed by the law as it then was, the nomination will be declared invalid, even though the election officers acted without fraudulent intention and honestly believed that they were doing what ought to be done under the peculiar circumstances of the case.

In line with the foregoing we would be strongly inclined to sustain the contention of contestant in this case and reject the vote in the second district for the Democratic candidates for supervisor were it not for a later opinion of our Supreme Court in Eckert's Election, 308 Pa. 375 (1932). While this decision was prior to the adoption of our present Election Code of

1937, yet there is not such difference in the law prior to 1937 as to affect the applicability of the decision to the facts now under consideration. See In re Conduct of Elections, 26 D. & C. 278.

In the said case of Eckert's Election our Supreme Court said (p. 378):

"As to the action of the election board in receiving the votes of fifty-eight qualified electors after seven o'clock, we are of opinion that under the circumstances disclosed by the record, and especially since no fraud is shown, these votes were properly received. These fifty-eight electors were within the polling place at seven o'clock, were qualified to vote, and were awaiting opportunity to do so. Under these circumstances the decision to receive the votes was not such an open disregard of legal requirements as to justify the court in rejecting the vote of the entire precinct. 'For mere irregularities in conducting an election, it (the election return) is not to be held void, even though the election officers may be subject to punishment for misconduct': West Mahanoy Township's Contested Election, 258 Pa. 176, 179. Petitioners' contention that the entire vote of the precinct should be thrown out because of the reception of these votes cannot be sustained. Furthermore, there is no allegation in the petition showing for whom these ballots were cast, nor is it possible from the record to determine which candidate received any part of these votes. The burden was upon petitioners to aver expressly that the fifty-eight votes were illegal, or that a sufficient number of them were cast for Eckert to change the result of the election; this the record fails to disclose and neither fact can be presumed: Zerby v. Snare, 107 Pa. 183."

It is not clear to us how it can be said as was said above that "*since no fraud is shown these votes were properly received*". The law then was and now is direct and positive. After stating, as hereinbefore recited, who may vote after the closing hour, it adds

*"but no other persons shall be permitted to vote"*. Likewise the statute fixing the time for opening and closing the polls is mandatory in language. As above pointed out our Constitution requires that election laws be uniform. If discretion be given election boards to vary the hours of voting uniformity ceases. Uniformity of law presupposes uniformity of enforcement. In Cramer's Election Case, 248 Pa. 208, 215 (1915), it was said:

"The position taken assumes that the provisions of the act above recited are directory merely, and not mandatory, and that no disregard of these will vitiate the poll except as actual fraud is shown, and then only as the fraudulent votes can not be separated from those legally cast. To this we cannot agree."

The other statement in the opinion that the burden was upon petitioners to aver that a sufficient number of the votes were cast for Eckert to change the result of the election would not have been our conclusion. The voters were legal voters. Our Constitution, as hereinbefore pointed out, preserves secrecy in voting. Where, as here, there were eight candidates and there were at last 63 votes received that, as we view it, should not have been received, it would seem unreasonable to require the impossible, that is to aver and prove that respondent received at least eight more of these 63 votes than did contestant. It was shown that respondent received 201 votes in this district and that contestant received 46 votes. However, the ruling of the Supreme Court is binding on this court and we cannot reject the entire Democratic vote of the second district as concerns the office of supervisor.

In our opinion the complaint in this case was not without probable cause and we deem it just that the costs shall be paid by the county.

As concerns punishment for official misconduct suggested by the Supreme Court, the following provisions of the Election Code would appear relevant, to wit:

"Section 1850. Any person who shall violate any of the provisions of this act, for which a penalty is not herein specifically provided, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine not exceeding one thousand ($1,000) dollars, or to undergo an imprisonment of not more than one (1) year, or both, in the discretion of the court. . . .

"Section 1852. Any person convicted of the willful violation of any provision of this act shall, in addition to any of the penalties herein provided for, be deprived of the right of suffrage absolutely for a term of four years from the date of his conviction, and it shall be the duty of the proper registration commission to cause one of its members at the request of the trial judge to produce in court at the time of sentence the district register containing the registration card of such convicted person, which registration card shall thereupon be forthwith cancelled in open court in the presence of the convicted person by a member of the registration commission, who shall promptly also cancel the registration card of such convicted person in the general register."

In line with the practice suggested in the Election Code at section 1611 (c) the record in this case will be certified to the District Attorney of Fayette County.

## Decree

And now, October 10, 1947, upon consideration of the foregoing cause, it is ordered, adjudged and decreed as follows:

1. That the petition herein and the rule granted thereon be, and the same are, hereby dismissed.

2. That the costs shall be paid by the county.

3. The prothonotary is directed to certify the entire record in this case to the District Attorney of Fayette County.