**[J-118A-F-2020] [OAJC: Donohue, J.]**
# IN THE SUPREME COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: CANVASS OF ABSENTEE AND MAIL-IN BALLOTS OF NOVEMBER 3, 2020 GENERAL ELECTION<br><br>APPEAL OF: DONALD J. TRUMP FOR PRESIDENT, INC. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | No. 31 EAP 2020<br><br><br>SUBMITTED: November 18, 2020 |
| IN RE: CANVASS OF ABSENTEE AND MAIL-IN BALLOTS OF NOVEMBER 3, 2020 GENERAL ELECTION<br><br>APPEAL OF: DONALD J. TRUMP FOR PRESIDENT, INC. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | No. 32 EAP 2020<br><br><br>SUBMITTED: November 18, 2020 |
| IN RE: CANVASS OF ABSENTEE AND MAIL-IN BALLOTS OF NOVEMBER 3, 2020 GENERAL ELECTION<br><br>APPEAL OF: DONALD J. TRUMP FOR PRESIDENT, INC. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | No. 33 EAP 2020<br><br><br>SUBMITTED: November 18, 2020 |
| IN RE: CANVASS OF ABSENTEE AND MAIL-IN BALLOTS OF NOVEMBER 3, 2020 GENERAL ELECTION<br><br>APPEAL OF: DONALD J. TRUMP FOR PRESIDENT, INC. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | No. 34 EAP 2020<br><br><br>SUBMITTED: November 18, 2020 |
| IN RE: CANVASS OF ABSENTEE AND MAIL-IN BALLOTS OF NOVEMBER 3, 2020 GENERAL ELECTION<br><br>APPEAL OF: DONALD J. TRUMP FOR PRESIDENT, INC. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | No. 35 EAP 2020<br><br><br>SUBMITTED: November 18, 2020 |
| IN RE: 2,349 BALLOTS IN THE 2020 GENERAL ELECTION | : <br> : <br> : <br> : | No. 29 WAP 2020 |

| APPEAL OF: ALLEGHENY COUNTY BOARD OF ELECTIONS | : Appeal from the Order of the |
|---|---|
| | : Commonwealth Court entered |
| | : November 19, 2020 at No. 1162 CD |
| | : 2020, reversing the Order of the |
| | : Court of Common Pleas of |
| | : Allegheny County entered November |
| | : 18, 2020 at No. GD 20-011654 and |
| | : remanding |
| | : |
| | : |
| | :                SUBMITTED: November 20, 2020 |

## CONCURRING AND DISSENTING OPINION

**JUSTICE WECHT**                                              **DECIDED:  November 23, 2020**

I agree with the conclusion that no mail-in or absentee ballot should be set aside solely because the voter failed to hand print his or her name and/or address on the declaration form on the ballot mailing envelope.  These items are prescribed not by statute but by the Secretary of the Commonwealth under legislatively delegated authority. Absent evidence of legislative intent that what in context amounts to redundant information must be furnished to validate a mail ballot, their omission alone should not deny an elector his or her vote.  But I part ways with the conclusion reflected in the Opinion Announcing the Judgment of the Court ("OAJC") that a voter's failure to comply with the statutory requirement that voters date the voter declaration should be overlooked as a "minor irregularity."  This requirement is stated in unambiguously mandatory terms, and nothing in the Election Code[1] suggests that the legislature intended that courts should

---

[1]      Act of June 3, 1937, P.L. 1333, art. I, § 101, *codified as amended at* 25 P.S. §§ 2601, *et seq.*

[J-118A-F-2020] [OAJC: Donohue, J.] - 2

construe its mandatory language as directory. Thus, in future elections, I would treat the date and sign requirement as mandatory in both particulars, with the omission of either item sufficient without more to invalidate the ballot in question.[2] However, under the circumstances in which the issue has arisen, I would apply my interpretation only prospectively. So despite my reservations about the OAJC's analysis, I concur in its disposition of these consolidated cases.

Concurring in this Court's recent decision in *Pennsylvania Democratic Party v. Boockvar*, I expressed my increasing discomfort with this Court's willingness to peer behind the curtain of mandatory statutory language in search of some unspoken directory intent.

> [If this Court is] to maintain a principled approach to statutory interpretation that comports with the mandate of our Statutory Construction Act,[3] if we are to maximize the likelihood that we interpret statutes faithfully to the drafters' intended effect, we must read mandatory language as it appears, and we must recognize that a mandate without consequence is no mandate at all.[4]

There, I wrote separately in support of this Court's ruling requiring the invalidation of mail-in ballots that were returned to boards of elections not sealed in their secrecy envelopes as required by statutory language. The secrecy envelope requirement at issue in that case was no less ambiguous than the "fill out, date and sign" mandate at issue in this

---

[2] None of the parties or courts involved in these consolidated cases dispute that a voter's failure to sign a mail-in or absentee ballot's declaration requires invalidation.

[3] Act of Dec. 6, 1972, No. 290, § 3, *codified as amended at* 1 Pa.C.S. §§ 1501, *et seq.*

[4] 238 A.3d 345, 391 (Pa. 2020) (Wecht, J., concurring) (hereinafter "*PDP*").

case.[5]  Nonetheless, departing from that holding for reasons that do not bear close scrutiny, the OAJC concludes that invalidation should *not* follow for failure to comply with the Election Code provisions requiring that "the elector shall . . . fill out, date and sign the declaration printed on" the ballot mailing envelope, even though this requirement appears in precisely the same statutory provisions as were at issue in *PDP*.

Section 3150.16 of the Election Code, governing "[v]oting by mail-in electors"— and its counterpart for absentee ballots, which employs the same operative language[6]— provides:

> At any time after receiving an official mail-in ballot, but on or before eight o'clock P.M. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. *The elector **shall** then fill out, date and sign the declaration printed on such envelope.* Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.[7]

---

[5]  Specifically, 25 P.S. § 3150.16(a) provides that the mail-in ballot elector "shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, *enclose and securely seal the same in the envelope on which is printed, stamped or endorsed 'Official Election Ballot.'*"

[6]  *Compare* 25 P.S. § 3150.16(a) ("Voting by mail-in electors") *with* 25 P.S. § 3146.6(a) ("Voting by absentee electors"). Each provision governing the form of mail-in ballots and the voter's obligations in preparing and transmitting them has its verbatim equivalent for absentee ballots, and the issue presented applies equally to both. Hereinafter, for simplicity's sake, I refer exclusively to mail-in ballots and cite and quote only the provisions that apply to mail-in ballots, but my analysis applies identically to both. The OAJC reproduces the relevant sections at length. *See* OAJC at 5-7.

[7]  25 P.S. § 3150.16(a) (emphasis added).

While this Court has not reviewed every constituent step this provision prescribes, we have addressed several of the requirements, taking it upon ourselves to weigh in each instance whether to interpret the mandatory statutory language as being mandatory in fact. The law those cases now comprise is so muddled as to defy consistent application, an inevitable consequence of well-meaning judicial efforts to embody a given view of what is faithful to the spirit of the law, with the unfortunate consequence that it is no longer clear what "shall" even means.

Nearly fifty years ago, this Court considered whether a ballot completed in red or green ink should be counted given that the statute provided by its terms only for the canvassing of ballots completed in blue/black ink.[8] Then-applicable Section 3063 of the Election Code provided that "[a]ny ballot that is marked in blue, black or blue-black ink, in fountain pen or ball point pen, or black lead pencil or indelible pencil, shall be valid and counted."[9] The Court determined that the Code did not require the invalidation of ballots completed in other colors, holding that the mandatory language was merely directory in effect:

> [T]he power to throw out a ballot for minor irregularities should be sparingly used. It should be done only for very compelling reasons. Marking a ballot in voting is a matter not of precision engineering but of an unmistakable registration of the voter's will in substantial conformity to statutory requirements. In construing election laws[,] while we must strictly enforce all provisions to prevent fraud over overriding concern at all times must be to be flexible in order to favor the right to vote. Our goal must be to enfranchise and not to disenfranchise. This section of the code merely assures the validity of ballots marked in blue, black or blue-black ink. It does not . . . specify that any other type of marking will necessarily be void. We have noted in other cases that the dominant theme of this section is to prevent ballots from being identifiable. A ballot should not be invalidated

---

[8]     *Appeal of Weiskerger*, 290 A.2d 108 (Pa. 1972).

[9]     25 P.S. § 3063 (applicable through October 30, 2019).

under [25 P.S. § 3063] unless the voter purposely makes a mark thereon or commits some other act in connection with this ballot to distinguish and identify it. The proper interpretation of this portion of the statute considering the occasion for its enactment, the mischief to be remedied, and the policy to liberally construe voting laws in the absence of fraud, is that the ballot is valid unless there is a clear showing that the ink used was for the purpose of making the ballot identifiable.[10]

As this Court later stressed in *Appeal of Pierce*, *Weiskerger* "was decided before the enactment of the Statutory Construction Act [("SCA")], which dictates that legislative intent is to be considered only when a statute is ambiguous."[11] Thus, while *Pierce* focused on distinguishing *Weiskerger*, it nonetheless implicitly called into question the *Weiskerger* Court's casual dismissal of the language of the statute there at issue because the various factors the *Weiskerger* Court cited as relevant to its decision not to give "shall" mandatory effect are relevant under the SCA only when the statute is susceptible of two or more reasonable interpretations.[12]

In insisting that a court's goal should be to "enfranchise and not to disenfranchise" and to be "flexible" in furtherance of that goal, the *Weiskerger* Court found itself awash in

---

[10]     *Weiskerger*, 290 A.2d at 109 (cleaned up).

[11]     *Appeal of Pierce*, 843 A.2d 1223, 1231 (Pa. 2004); *see* 1 Pa.C.S. 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."); *see also Oberneder v. Link Computer Corp.*, 696 A.2d 148, 150 n.2 (Pa. 1997) (rejecting a party's reliance upon a 1965 case because it was at odds with the ambiguity-first, reliance-upon-rules-of-construction-later approach to statutory construction required by the SCA).

[12]     Without suggesting that the ink color language at issue in that case was ambiguous on its face, the *Weiskerger* Court suggested that interpreting the language required it to consider, *inter alia*, "the occasion for its enactment" and "the mischief to be remedied." *Weiskerger*, 290 A.2d at 109. Section 1921 of the SCA similarly provides that courts may consider "[t]he occasion and necessity for the statute" and "[t]he mischief to be remedied"—but *only* "[w]hen the words of the statute are not explicit." 1 Pa.C.S. § 1921(c).

language so slippery as to defy consistent application. The Court posited the existence of "minor irregularities," a term we repeat often but have yet to define with suitable rigor,[13] and posited that ballots should be invalidated only for "very compelling reasons."[14] It also blessed "substantial conformity," and directed courts to "be flexible in order to favor the right to vote"—evidently even when doing so runs counter to statutory directives stated in mandatory terms.[15]

Perhaps most troublingly, the Court posited that its "*goal* must be to enfranchise and not to disenfranchise."[16] A court's only "goal" should be to remain faithful to the terms of the statute that the General Assembly enacted, employing only one juridical presumption when faced with unambiguous language: that the legislature *meant what it said*. And even where the legislature's goal, however objectionable, is to impose a requirement that appears to have a disenfranchising effect, it may do so to any extent that steers clear of constitutional protections. In any event, even if the *Weiskerger* Court

---

[13]   *See, e.g., Appeal of Norwood*, 116 A.2d 552, 555 (Pa. 1955); *Appeal of Gallagher*, 41 A.2d 630, 632 (Pa. 1945).

[14]   *Weiskerger*, 290 A.2d at 109 (quoting *In re Petitions to Open Ballot Boxes*, 188 A.2d 254, 256 (Pa. 1963)).

[15]   In contrast to *Weiskerger*'s capacious understanding of this principle, the Court adopted a more measured tone in *Appeal of Urbano*, 190 A.2d 719 (Pa. 1963). There, citing the presumption in favor of counting votes, it allowed for relief from the apparent consequences of failing to satisfy mandatory statutory language, but did so specifically because the common-law presumption was in keeping with additional statutory language expressly granting the court discretion to permit amendments to cure even "material errors or defects." *Id.*

[16]   *Weiskerger*, 290 A.2d at 109 (emphasis added).

faithfully applied the common-law principles it cited, it did so inconsistently with the SCA's contrary guidance, which issued later the same year and binds us today.[17]

But the advent of the SCA did not prevent this Court from repeating the same mistake even decades later. In *Shambach v. Bickhart,*[18] a voter wrote in a candidate for office despite the fact that the candidate appeared on the official ballot for that office. This facially violated the Election Code, which provided that the voter shall, in the designated area, "write the identification of the office in question and the name of *any person not already printed on the ballot for that office*, and such mark and written insertion shall count as a vote for that person for such office."[19] Echoing *Weiskerger*, the *Shambach* Court observed that, "although election laws must be strictly construed to prevent fraud, they

---

[17] To be clear, *Weiskerger* was by no means our original sin in this area. In one earlier example cited by the OAJC, this Court discerned reason to disregard the mandatory connotation of "shall" in *Appeal of James*, 105 A.2d 64 (Pa. 1954). Indeed, one can detect aspects of the same open-ended analysis in, *e.g.*, our 1922 decision in *In re Fish's Election*, 117 A. 85, 87 (Pa. 1922) (quoting *Knight v. Borough of Coudersport*, 92 A. 299, 300 (Pa. 1914)) ("If the law declares a specified irregularity to be fatal, the court will follow that command, irrespective of their views of the importance of the requirement. In the absence of such declaration the judiciary endeavor, as best they may, to discern whether the deviation from the prescribed forms of law had or had not so vital an influence on the proceedings as probably prevented a full and free expression of the popular will. . . . [If not], it is considered immaterial."). Our willingness to substitute our judgment for that of the legislature perhaps reached its nadir in *Norwood*, where we held that "[e]very rationalization within the realm of common sense should aim at saving [a] ballot rather than void it," 116 A.2d at 554-55, an expression that the OAJC embraces as a "well-settled principle of Pennsylvania election law." OAJC at 19. Perhaps no passage better illustrates the liberties this Court has taken when probing for reasons to treat mandatory language as anything but mandatory.

[18] 845 A.2d 793 (Pa. 2004).

[19] 25 P.S. § 3031.12(b)(3) (emphasis added). The language in question has been amended in the intervening years.

ordinarily will be construed liberally in favor of the right to vote."[20]  Thus, the Court "[has] held that ballots containing mere irregularities should only be stricken for compelling reasons."[21]  In support of this particular proposition, though, the Court cited only decisions that predated the SCA.[22]  Much as in *Weiskerger*, the Court held that the absence of statutory language requiring the invalidation of a ballot completed in violation of the mandatory language of Section 3031.12(b)(3), combined with the amorphous principles it drew from the Court's prior cases, precluded the invalidation of a nonconforming ballot, effectively writing unambiguous language out of the Election Code entirely.

We restored a greater degree of rigor in *Pierce*.  In that case, we considered whether absentee ballots delivered by third persons on behalf of non-disabled voters were invalid under the Election Code, which provided that "*the elector shall* send [the absentee ballot] by mail, postage prepaid, except where franked, *or deliver it in person* to said county board of election."[23]  There, in a step the *Shambach* Court tacitly bypassed, the Court underscored the SCA's direction that a court's sole objective in construing a statute is to "ascertain and effectuate the intention of the General Assembly," and that, "[g]enerally speaking, the best indication of legislative intent is the plain language of a

---

[20]     *Shambach*, 845 A.2d at 798 (quoting *James*, 105 A.2d at 65).

[21]     *Id.* at 798.

[22]     *See Appeal of Mellody*, 296 A.2d 782, 784 (Pa. 1972); *Reading Defense Committee*, 188 A.2d at 256; *Gallagher*, 41 A.2d at 632.  The OAJC similarly relies substantially for these principles on pre-SCA case law.  *See, e.g.*, OAJC at 3 (quoting *James*, 105 A.2d at 65-66 (Pa. 1954)); *id.* at 19 (quoting *Urbano*, 190 A.2d at 719, and *Norwood*, 116 A.2d at 554).

[23]     25 P.S. § 3146.6(a) (emphasis added); *see Pierce*, 843 A.2d at 1231.

statute."[24]  "[I]t is only when the words of a statute 'are not explicit' that a court may resort to other considerations, such as the statute's perceived 'purpose,' in order to ascertain legislative intent."[25]  In this light, the Court turned to the legislature's use of the word "shall."  "Although some contexts may leave the precise meaning of the word 'shall' in doubt," the Court opined, "this Court has repeatedly recognized the unambiguous meaning of the word in most contexts."[26]  As noted *supra*, this Court in *Pierce* declined to treat *Weiskerger* as controlling in part because it was decided before the enactment of the SCA.  While we did not assert *Weiskerger*'s abrogation, we certainly cast doubt upon its probity, as well, by extension, as all similarly permissive Election Code case law relying upon the presumption to count votes that violated the Code's unambiguous directives.

In *In re Scroggin*,[27] too, we applied the relevant statutory language strictly in conformity with its terms, despite colorable arguments that doing so would deny ballot access to a candidate who had "substantially complied" with the statutory requirements. And at issue in that case was not merely the votes of a small percentage of otherwise qualified voters, but whether a political body's Presidential candidate would appear on the ballot at all in the wake of a placeholder nominee's failure to satisfy the Code's mandatory affidavit requirement.  "[T]he provisions of the election laws relating to the form of nominating petitions and the accompanying affidavits are not mere technicalities," we

---

[24]  *Pierce*, 843 A.2d at 1230 (citations omitted).

[25]  *Id.*

[26]  *Id.* at 1231-32 (citing, *inter alia*, BRYAN GARNER, DICTIONARY OF MODERN LEGAL USAGE 939 (2d ed. 1995)).

[27]  237 A.3d 1006 (Pa. 2020).

explained, "but are necessary measures to prevent fraud and to preserve the integrity of the election process. . . . Thus, the policy of the liberal reading of the Election Code cannot be distorted to emasculate those requirements necessary to assure the probity of the process."[28]

Finally, in *PDP*, we held that the failure strictly to comply with the Election Code's mandatory requirement that mail-in ballots be sealed in the provided "Official Election Ballot" envelope required invalidation. Again, we specifically rejected the appellants' reliance upon *Weiskerger* and *Shambach*, relying instead upon *Pierce*. As in *Pierce*, we found that to interpret "shall" as directory rather than mandatory would render the Code's requirements "meaningless and, ultimately, absurd," notwithstanding the absence of an express, statutorily-prescribed sanction for non-compliance.[29] While we did not go out of our way to express as jaundiced a view of our cases holding that "minor irregularities" might be overlooked, the gravamen of our decision in that case, as in *Pierce*, was clear: shall means *shall*.[30]

Although I joined the Majority in that case, I wrote separately to underscore the difficulties endemic to judicial efforts to discern ulterior meanings ostensibly obscured by the legislature's use of mandatory language. I observed that relying upon such unbounded investigations invited courts "to bend unclear texts toward whatever ends that

---

[28]    *Id.* at 1019 (quoting *Appeal of Cubbage*, 359 A.2d 383, 384 (Pa. 1976)).

[29]    *PDP*, 238 A.3d at 379 (quoting *Pierce*, 843 A.2d at 1232).

[30]    *Id.* at 380 ("[*Pierce*] leads to the inescapable conclusion that a mail-in ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified. . . . Accordingly, we hold that the secrecy [envelope] language in Section 3150.16(a) is mandatory and the mail-in elector's failure to comply . . . renders the ballot invalid.").

they believe to be consonant with legislative intent, but with little or no contemporaneous insight into whether they have done so successfully."[31]  Acknowledging that legislation is sometimes less than a model of clarity, and that this Court consequently will continue to face invitations to treat mandatory language as something less, I wrote: "[I]f we are to maintain a principled approach to statutory interpretation that comports with the mandate of [the SCA], if we are to maximize the likelihood that we interpret statutes faithfully to the drafters' intended effect, we must read mandatory language as it appears, and we must recognize that a mandate without consequence is no mandate at all."[32]

It is against this case law, and particularly the views I expressed in *PDP*, that I review the question now before us, briefly addressing the Secretary-imposed name and address requirement first, before proceeding to consider the statutory requirement that the voter date and sign the voter declaration.

As to the former question, I agree with the OAJC's conclusion, although I subscribe to the narrower approach briefly set forth by Justice Dougherty in his Concurring and Dissenting Opinion and developed variously in the OAJC's analysis.  But while the OAJC acknowledges the reasons that Justice Dougherty cites as militating against invalidation, it supplements them with the minor-irregularity analysis familiar from *Weiskerger* and *Shambach*, which is neither necessary nor advisable.  Justice Dougherty's approach requires no reliance upon cases that *Pierce* and *PDP* rightly have called into question. Rather, the fact that the name and address requirement does not stem from mandatory

---

[31]     *Id*. at 391 (Wecht, J., concurring).

[32]     *Id*.

statutory language,[33] as well as questions about the Secretary's authority to compel county boards of elections to conform with whatever guidance the Secretary offers,[34] combined with our presumption in favor of treating qualified voters' ballots as valid absent clear legal mandates to the contrary where statutory language is less than clear,[35] collectively recommend against invalidating ballots for this omission alone.[36]   That is enough for me.

The same cannot be said about the date and sign requirement, which derives from an unmistakable statutory directive.  Drawing upon our less rigorous case law, and relying heavily upon the interpretive latitude this Court has arrogated to itself sporadically for generations, the OAJC assumes that our mission is to determine whether the apparent mandate is in fact directory, hanging the entire inquiry upon the question of mandatory versus directory effect.   That reading, in turn, must rely upon the "minor

---

[33]      *See* Conc. & Diss. Op. at 2 (Dougherty, J.).

[34]      *See* OAJC at 32-33 n.6.

[35]      *See PDP*, 238 A.3d at 356 ("[T]he Election Code should be liberally construed so as not to deprive, *inter alia*, electors of their right to elect a candidate of their choice."). Notably, the OAJC cites *PDP* for the same proposition, correctly qualifying the principle by noting that liberal construction comes into play only "[*w*]*here an election statute is ambiguous*." OAJC at 25 n.4 (emphasis added).

[36]      I also find cause for concern in the absence of clear instruction on the ballot materials indicating that a ballot lacking a name or address will be disqualified, a concern that informs my preference for prospective application of the statutory date requirement. *Cf. Reading*, 188 A.2d at 256 (declining to invalidate ballots upon which voters did not signal their intended votes strictly with the X or check mark mandated by statute for various reasons—including a "minor irregularity" approach I reject—especially where the printed instruction on the ballot did not specify that only those two methods of signaling one's vote would be recognized).

irregularity" / "weighty interest" dichotomy underlying the cases that *Pierce* and *PDP* have

called into question.

> To determine whether the Election Code's directive that the voter handwrite their names, address, and the date of signing the voter declaration on the back of the outer envelope is a mandatory or directory instruction requires us to determine whether the intent of the General Assembly was clear and whether the failure to handwrite the information constitutes "minor irregularities" or instead represent[s] "weighty interests" . . . that the General Assembly considered to be critical to the integrity of the election.[37]

To be clear, the OAJC offers a commendably thorough analysis, but its length and

involution is necessary only *because* of the open-ended inquiry it embarks upon. And it

is no surprise that, like the cases upon which it relies, the OAJC involves protean

characterizations of voting requirements as "technicalities,"[38] "minor irregularities,"[39] and

---

[37]      OAJC at 23.

[38]      *See id.* at 3 (quoting *James*, 105 A.2d at 66 ("Technicalities should not be used to make the right of the voter insecure.")). *James*'s tendentious resort to the word "technicalities," which seldom is used constructively when invoked in connection with the law, is contradicted at least in tenor by subsequent pronouncements. *See Pierce*, 843 A.2d at 1234 ("[S]o-called technicalities of the Election Code are necessary for the preservation of secrecy and the sanctity of the ballot and must therefore be observed . . . ."); *Appeal of Weber*, 159 A.2d 901, 905 (Pa. 1960) ("The technicalities of the Election Law (and they are many) are necessary for the preservation of the secrecy and purity of the ballot and must, therefore, be meticulously observed.").

[39]      *See* OAJC at 22-23 (counterposing "minor irregularities" and "weighty interests" as the framework for decision). Notably, the question as to which we granted review quite confused the meaning of "irregularity." We proposed to answer the question whether "the Election Code require[s] county boards of elections to disqualify mail-in or absentee ballots submitted by qualified electors who signed their ballot's outer envelopes but did not handwrite their name, their address, and/or a date, *where no fraud or irregularity has been alleged*?" *Id.* at 15. But this formulation is irreconcilable with the question whether failing to date a ballot declaration is, itself, a "minor irregularity" and, as such, not subject to the sanction of ballot invalidation—the very crux of the case, as the OAJC defines it. I raise this discrepancy because it illustrates how these constructs lend themselves to confusion, complicating what should be simple questions by engrafting unenumerated considerations upon plainly worded statutes.

even "superfluous."[40] As illustrated in my review of earlier case law, the OAJC does not conjure this terminology from the ether—all but the last of these terms have been central to this Court's decisional law going back decades. But properly understood, all of these terms signal (and implicitly bless) the substitution of judicial appraisals for legislative judgments.

The OAJC's approach ultimately requires that in *any* case requiring interpretation of the Election Code to determine the validity of votes nonconforming with facially mandatory requirements, the Court must assess the effect of that language *de novo* before deciding whether the legislature intended for it to be interpreted as mandatory or merely directory.[41] Thus, while a court embracing that test might take it as obvious, *e.g.*, that the signature requirement should be construed as mandatory, it could not merely have taken its mandatory effect as a given by virtue of the statutory language alone. If the mandatory/directory inquiry is ever appropriately applied to mandatory language, then the Court can only conclude that mandatory language must be applied as such after applying its balancing test, with cases that *seem* obvious merely reflecting that the Court deemed the "interest" to be protected so "weighty" that its omission clearly cannot be viewed as a "minor irregularity."

---

[40]     *See id.* at 30 ("The date stamp and the SURE system provide a clear and objective indicator of timeliness, making any handwritten date unnecessary and, indeed, superfluous."); *cf. id.* at 23 (characterizing the handwritten name and address requirement as, "at best, a 'minor irregularity' and, at worst, entirely immaterial").

[41]     *See id.* at 30 ("Although unlike the handwritten name and address, which are not mentioned in the statute, the inclusion of the word 'date' in the statute does not change the analysis *because the word 'shall' is not determinative as to whether the obligation is mandatory or direct[ory] in nature.*" (emphasis added)).

The only practical and principled alternative is to read "shall" as mandatory. Only by doing so may we restore to the legislature the onus for making policy judgments about what requirements are necessary to ensure the security of our elections against fraud and avoid inconsistent application of the law, especially given the certainty of disparate views of what constitute "minor irregularities" and countervailing "weighty interests."

I do not dispute that colorable arguments may be mounted to challenge the necessity of the date requirement, and the OAJC recites just such arguments.[42] But colorable arguments also suggest its importance, as detailed in Judge Brobson's opinion as well as Justice Dougherty's Concurring and Dissenting Opinion.[43] And even to *indulge* these arguments requires the court to referee a tug of war in which unambiguous statutory language serves as the rope. That reasonable arguments may be mounted for and against a mandatory reading only illustrates precisely why we have no business doing so.

Ultimately, I agree with Judge Brobson's description of the greatest risk that arises from questioning the intended effect of mandatory language on a case-by-case basis:

> While we realize that our decision in this case means that some votes will not be counted, the decision is grounded in law. It ensures that the votes will not be counted because the votes are invalid as a matter of law. Such adherence to the law ensures equal elections throughout the Commonwealth, on terms set by the General Assembly. The danger to our democracy is not that electors who failed to follow the law in casting their ballots will have their ballots set aside due to their own error; rather, the real danger is leaving it to each county board of election to decide what laws must be followed (mandatory) and what laws are optional (directory), providing a patchwork of unwritten and arbitrary rules that will have some defective ballots counted and others discarded, depending on the county in which a voter resides. Such a patchwork system does not guarantee voters

---

[42]     *See id.* at 30-32.

[43]     *See In re 2,349 Ballots in the 2020 General Election*, 1162 C.D. 2020, slip op. at 12 (Pa. Cmwlth. Nov. 19., 2020) (memorandum); Conc. & Diss. Op. at 3 (Dougherty, J.).

an "equal" election, particularly where the election involves inter-county and statewide offices. We do not enfranchise voters by absolving them of their responsibility to execute their ballots in accordance with law.[44]

We must prefer the sometimes-unsatisfying clarity of interpreting mandatory language as such over the burden of seeking The Good in its subtext. Substantive perfection is the ever-elusive concern of the legislature. Ours must be consistency of interpretive method without fear or favor, a goal that recedes each time a court takes liberties with statutory language in furtherance of salutary abstractions. Because the OAJC favors a more intrusive and ambitious inquiry, I respectfully dissent.

But just because I disagree with the OAJC's interpretation of the date and sign requirement does not inexorably lead me to the conclusion that the votes at issue in this case must be disqualified. While it is axiomatic that *ignorantia legis neminem excusat* (ignorance of the law excuses no one), this Court may elect to apply only prospectively a ruling that overturns pre-existing law or issues a ruling of first impression not foreshadowed by existing law. Indeed, we have done so in at least one case under the Election Code. In *Appeal of Zentner*,[45] we confronted a statute governing candidates' obligation to submit statements of financial interests by a time certain that had been revised specifically to correct our previously fluid interpretations of the predecessor statute. We were forced to consider whether our newly strict construal of the revised statute should result in the invalidation of entire ballots already cast because they included one or more candidates who had failed to satisfy the statutory disclosures. We

---

[44]     *In re 2,349 Ballots*, slip op. at 12-13.

[45]     626 A.2d 146 (Pa. 1993)

held, as the legislature clearly intended, that a candidate's "failure to file the requisite financial interests statement within the prescribed time shall be fatal to a candidacy."[46] But we also concluded that to "void the results of an election where all candidates were submitted to the voters, with late but nonetheless filed financial statements which left adequate time for study by the electorate, would be an unnecessary disenfranchisement."[47] Thus we determined that our holding should apply prospectively but not to the election at issue.[48]

It goes without saying that 2020 has been an historically tumultuous year. In October of 2019, the legislature enacted Act 77,[49] introducing no-excuse mail-in voting with no inkling that a looming pandemic would motivate millions of people to avail themselves of the opportunity to cast their ballots from home in the very first year that the law applied. Soon thereafter, Act 12,[50] introduced and enacted with unprecedented

---

[46]     *Id.* at 149.

[47]     *Id.*

[48]     *Cf. Andino v. Middleton*, No. 20A55, ___ U.S. ___, 2020 WL 5887393, *1 (Oct. 5, 2020) (staying the district court's injunction of an absentee ballot witness requirement, "except to the extent that any ballots cast before this stay issues and received within two days of this order may not be rejected for failing to comply with the witness requirement" in light of the fact that voters cast nonconforming absentee ballots in reliance upon the guidance of state elections officials during the pendency of the injunction); *In re Beyer*, 115 A.3d 835, 843-44 (Pa. 2015) (Baer, J., dissenting) (finding it "reasonable for this Court to rule prospectively that a candidate may only designate his occupation or profession as 'lawyer' on nomination papers after he or she has graduated from law school, passed the bar exam, and is in good standing as an active member of the Pennsylvania Bar," but dissenting because, "at the time Candidate Beyer filed his nomination papers, neither a majority of this Court nor the Commonwealth Court had ever made such an express declaration").

[49]     *See* Act of Oct. 31, 2019, P.L. 552, No. 77.

[50]     *See* Act of March 27, 2020, P.L. 41, No. 12.

alacrity in response to the pandemic, further amended the Election Code to address emergent concerns prompted by the looming public health crisis. While aspects of the new provisions that are relevant to this case were not wholly novel to the Code, as such—for example, the provisions that authorized no-excuse mail-in voting by and large just expanded the pool of voters to whom the rules that long had governed absentee balloting applied—the massive expansion of mail-in voting nonetheless presented tremendous challenges to everyone involved in the administration of elections, from local poll workers to the Secretary of the Commonwealth. Importantly, it transformed the incentives of probing the mail-in balloting provisions for vulnerabilities in furtherance of invalidating votes. For the first time, a successful challenge arising from a given technical violation of statutory requirements might result in the invalidation of many thousands of no-excuse mail-in ballots rather than scores or hundreds of absentee ballots.

In advance of the 2020 election, neither this Court nor the Commonwealth Court had occasion to issue a precedential ruling directly implicating the fill out, date and sign requirement. Moreover, as the OAJC highlights in multiple connections, the Secretary issued confusing, even contradictory guidance on the subject.[51] Thus, local election officials and voters alike lacked clear information regarding the consequence of, *e.g.*, failing to handwrite one's address on an envelope that already contained preprinted text with that exact address or record the date beside the voter's declaration signature.

I have returned throughout this opinion to our decision in *PDP*, and I do so once more. I maintained in that case that the Election Code should be interpreted with

---

[51]     *See* OAJC at 24 n.3, 32-33 n.6; *see also id.* at 8-10 (reproducing all relevant aspects of the guidance documents pertaining to the issues presented).

unstinting fidelity to its terms, and that election officials should disqualify ballots that do not comply with unambiguous statutory requirements, when determining noncompliance requires no exercise of subjective judgment by election officials.[52]  The date requirement here presents such a case.  But I *also* emphasized that disqualification is appropriate "[s]o long as the Secretary and county boards of elections *provide electors with adequate instructions for completing the declaration of the elector—including conspicuous warnings regarding the consequences for failing strictly to adhere*" to those requirements.[53]  I cannot say with any confidence that even diligent electors were adequately informed as to what was required to avoid the consequence of disqualification in this case.  As in *Zentner*, it would be unfair to punish voters for the incidents of systemic growing pains.

In case after case involving the Election Code, especially this year, we have been reminded how important it is that the General Assembly provide unambiguous guidance for the administration of the election process.  But it is imperative that we recognize when the legislature has done precisely that, and resolve not to question the legislature's chosen language when it has done so.  And perhaps it is a silver lining that many of the problems that we have encountered this year, in which a substantially overhauled electoral system has been forced to make its maiden run in stormy seas, are now clear enough that the legislature and Department of State have notice of what statutory refinements are most needful.  It is my sincere hope that the General Assembly sees fit to refine and clarify the Election Code scrupulously in the light of lived experience.  In particular, because this is the second time this Court has been called upon to address the

---

[52]    *See PDP*, 238 A.3d at 389 (Wecht, J., concurring).

[53]    *See id.* (emphasis added).

declaration requirement, it seems clear that the General Assembly might clarify and streamline the form and function of the declaration, perhaps prescribing its form to advance clarity and uniformity across the Commonwealth.[54]

---

[54] In this regard, the OAJC observes that the Democratic National Committee "argues, with some persuasive force, that the Campaign's requested interpretation of Pennsylvania's Election Code could lead to a violation of [the federal Voting Rights Act] by asking the state to deny the right to vote for immaterial reasons." OAJC at 26 n.5; *see* 52 U.S.C. § 10101(a)(2) ("No person acting under color of law shall . . . (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election . . . ."). The OAJC does not pursue this argument, except to acknowledge a handful of cases that might be read to suggest that the name and address, and perhaps even the date requirement could qualify as "not material in determining whether such individual is qualified under State law to vote." Given the complexity of the question, I would not reach it without the benefit of thorough advocacy. But I certainly would expect the General Assembly to bear that binding provision in mind when it reviews our Election Code. It is inconsistent with protecting the right to vote to insert more impediments to its exercise than considerations of fraud, election security, and voter qualifications require.